UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| ERIK FORTMAN, TYSON FORTMAN, and KEITHA HERNANDEZ, Individually, and As Wrongful Death Beneficiaries of JAY FORTMAN, Deceased <br><br> vs. <br><br> NISSAN MOTOR CO., LTD. and NISSAN NORTH AMERICA, INC. | Civil Action No. 1:21-cv-00660 |

## PLAINTIFFS' ORIGINAL COMPLAINT

TO THE HONORABLE UNITED STATES DISTRICT COURT JUDGE:

COME NOW, ERIK FORTMAN, TYSON FORTMAN, and KEITHA HERNANDEZ Individually, and As Wrongful Death Beneficiaries of JAY FORTMAN, Deceased, Plaintiffs, by and through their undersigned counsel, complaining of NISSAN MOTOR CO., LTD. and NISSAN NORTH AMERICA, INC., Defendants, and for cause of action would show the Court the following:

### I.   PARTIES

1.   Plaintiffs are individuals and residents of Texas.

2.   Defendant Nissan Motor Co., Ltd. is a Japanese business organization, the precise nature of which is not known to Plaintiffs, and said Defendant is doing business in Texas, although not registered to do so. Nissan Motor Co., Ltd. is engaged in business in this state within the meaning of that term as defined by § 17.042, TEX. R. CIV. PRAC. & REM. CODE, and may be served with process pursuant to the Hague Convention, 20 U.S.T. 361 (February 10, 1969) as authorized by Fed. R. Civ. P. 4(f). Pursuant thereto, service of process may be effected by serving a true and correct copy of the summons, with a copy of the Complaint attached thereto, to Nissan Motor Co.,

Ltd., 1-1, Takashima 1-chome, Nishi-ku, Yokohama-shi, Kanagawa 220-8686, Japan.

3.      Defendant Nissan North America, Inc. is a Tennessee corporation doing business in Texas and can be served with summons through its registered agent, Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701.

4.      Defendants Nissan Motor Co., Ltd. and Nissan North America, Inc. may be referred to collectively in this Complaint as "the Nissan Defendants" or "Nissan."

## II.    JURISDICTION AND VENUE

5.      This is a product liability and negligence cause of action arising out of a vehicular accident that occurred in the Western District of Texas.

6.      The Defendants have their principal places of business in a state other than Texas. Jurisdiction, therefore, attaches pursuant to 28 U.S.C. § 1332 because there is diversity of parties, and the amount in controversy exceeds seventy-five thousand dollars ($75,000.00).

## III.   FACTUAL BACKGROUND

7.      This is a strict products liability and negligence case in which Plaintiffs seek monetary relief over $1,000,000.00 and a demand for judgment for all the other relief to which Plaintiffs deems themselves entitled.

8.      On or about May 2, 2020, at approximately 8:08 p.m., Jay Fortman ("Mrs. Fortman") was the properly belted driver of a 2020 Nissan Rogue (VIN# JN8AT2MT8LW003892) ("the Nissan Rogue" and/or "the subject vehicle") traveling southbound on US 183 in Caldwell County, Texas.

9.      As Mrs. Fortman began to slow to turn left onto Old Luling Road, the Nissan Rogue she occupied was hit in the rear by another vehicle.

10.     Although Mrs. Fortman was properly restrained, the Nissan Rogue's seatback failed in the collision and collapsed rearward projecting Mrs. Fortman into the rear of the passenger

compartment. Additionally, the driver's seat head restraint became dislodged in the crash which exacerbated Mrs. Fortman's head impact with rear compartment components. The photographs below show the collapsed driver's seat seatback after the accident.



**The seatback collapsed rearward and the head restraint was dislodged from the seatback causing Mrs. Fortman's body to ramp up the seatback, leading to severe trauma to her head as she struck the second row seating area.**



11. Mrs. Fortman was pronounced dead at the scene.

12. Nissan designed, manufactured, assembled, and placed into the stream of commerce the Nissan Rogue.

13. Nissan had actual knowledge of the need for its motor vehicles to be crashworthy.

14. The Nissan Rogue's driver seat was not crashworthy and contained defects.

15. The Nissan Rogue's driver seat was negligently designed and manufactured.

16. Nissan's negligent conduct was attributable to its employees and/or agents who, at all times relevant, were acting within the course, purpose, and scope of their employment and/or agency, and with the authority, consent, approval, and ratification of Nissan.

17. Nothing Mrs. Fortman did or failed to do at the time of the collision caused or in any way contributed to cause her fatal injuries. To the contrary, Mrs. Fortman's injuries were proximately caused by the negligence and defective design of the Nissan Rogue's driver seat.

18. Therefore, the vehicle's seat design, manufacturing, and marketing defects were a producing and proximate cause of the death of Mrs. Fortman, who leaves behind three children.

## IV.   CRASHWORTHINESS OVERVIEW

19. Crashworthiness is the science of preventing or minimizing injuries or death following an accident through use of a vehicle's various safety systems.[1]

20. There are five (5) recognized crashworthiness principles in the automobile industry/throughout the world. They are as follows:

    1. Maintain survival space;
    2. Provide proper restraint throughout the entire accident;
    3. Prevent ejection;
    4. Distribute and channel energy; and
    5. Prevent post-crash fires.

---

[1] In any crashworthiness case, the distinction between the cause of an accident versus the cause of injuries is an important one. One of the best analogies is the case of the Titanic. While the cause of hitting the iceberg has been subject to much debate (inattentiveness, the captain may have been drinking, they were going too fast, etc.), there is no question that every passenger which entered a lifeboat that night lived, while 99% of those who went into the water died. Accordingly, had the Titanic had enough lifeboats on board (i.e., the boat's "safety systems"), 100% of the people on board would have probably lived. So, the cause of the sinking (the accident) is irrelevant via-á-vis how everyone died. What's important is how the safety systems worked (or didn't work) following the accident.

21.    When the National Highway Traffic Safety Administration (NHTSA) created the Federal Motor Vehicle Safety Standard (FMVSS) in the late 1960s, the preamble to the safety standards included a crashworthiness definition similar to that used above, "that the public is protected against unreasonable risk of crashes occurring as a result of the design, construction, or performance of motor vehicles and is also protected against unreasonable risk of death or injury in the event crashes do occur."

22.    The National Transportation Safety Board (NTSB) has also stated that "Vehicle crashworthiness refers to the capacity of a vehicle to protect its occupants from crash forces. This protection – which is achieved, in part, by vehicle structure – includes maintaining a survival space around the occupant, retaining the occupant within the space, and reducing the forces applied to the occupant."

23.    Crashworthiness safety systems in a vehicle must work together like links in a safety chain. If one link fails, the whole chain fails. For example, in a rollover, if the roof collapses such that no survival space is left, it does not matter what kind of restraint system, glass, fuel system, or energy absorbing system is used, because these systems have been rendered moot.

24.    Automotive manufacturers have known for decades that there is a distinction between the cause of an accident versus the cause of an injury.

25.    For instance, General Motors has admitted this under oath. General Motors has even stated that it is irrelevant who caused an accident, and that safety systems have to perform properly no matter who causes an accident.

V.    **DUTY TO MAKE A SAFE VEHICLE**

26.    For decades, automobile manufacturers have been telling the general public and others how important it is to make safe vehicles.

27. For instance, in 1993, General Motors stated that "Safety isn't one thing. It's everything." Mary Barra, CEO of General Motors, testified to Congress in 2014 that, "Our customers and their safety are at the center of everything we do." Jeff Boyer, Vice-President of Global Vehicle Safety at General Motors, has stated that "Nothing is more important than the safety of our customers in the vehicles they drive."

28. General Motors has also stated in the past that, "The rich don't deserve to be safer … Isn't it time we realized safety is not just for the pampered and the privileged? Safety is for all."

29. Ford has stated in the past that it is so obsessed with safety that only a person's mother is more obsessed with that person's safety than Ford.

30. Ford has testified under oath that Ford "has a moral obligation to do those things that are feasible and practical to reduce the risk of injury and death to customers."

31. Lee Iacocca, former president of Ford Motor Company stated, while President and CEO of Chrysler, that "Every American has the to a safe vehicle." Gerald Greenwald, chairman of Chrysler, then sent a letter to every Chrysler dealership in 1988 stating that Chrysler intended to honor that right.

32. Honda believes that safety is for everyone, including for other vehicle occupants and for pedestrians.



33. Volvo has stated that, "Technologies for meeting the goal of zero injuries and fatalities are basically known today – it is a matter of how to apply, finance, distribute, and activate."

34. In a deposition of Randy Dale, Nissan North America's Corporate Representative, testified to the following:



Deposition of Randy Dale (Rayborn vs. Nissan Motor Co., Ltd., et al), p. 17 on March 4, 2021

35. Because every American has the right to a safe vehicle, because safety is for all, and because technologies for meeting the goal of zero injuries and fatalities are basically known today, it is incumbent upon auto manufacturers to investigate and find out what other automakers are doing with regards to safety and to apply those same methods or technology to their own vehicle.

36. Furthermore, an automaker cannot choose to use safe technology in Europe, Australia, Japan, or some other country and refuse to fail to offer that same safety technology to its consumers in America.

37. It is further incumbent upon auto manufacturers to protect consumers by using knowledge that a manufacturer has acquired over decades and decades of vehicle design, testing, and reverse engineering of other manufacturers' vehicles.

38. In fact, insofar as society permits manufacturers to operate in such a way that they are permitted to sell highly complex, potentially dangerous, and also highly profitable products on the market, manufacturers have a duty to do their best to ensure that the vehicle will not be harmful to buyers, their households, or third parties.

### VI. CAUSES OF ACTION AS TO DEFENDANT NISSAN MOTOR CO., LTD.

*A. Count One: Strict Liability and Defective Design/Manufacture/Failure to Warn*

39. Plaintiffs incorporate by reference each and all of the allegations contained in the preceding paragraphs as though fully set forth herein.

40. Defendant Nissan Motor Co., Ltd. is in the business of designing, manufacturing, testing, assembling, marketing and/or distributing vehicles, including the subject vehicle.

41. Defendant Nissan Motor Co., Ltd. designed, manufactured, tested, assembled, marketed, distributed, and/or sold the vehicle that was involved in the accident that killed Mrs. Fortman.

42. The Nissan Rogue was defective and unreasonably dangerous for its intended use.

43. The Nissan Rogue was defective at the time it left Defendant Nissan Motor Co., Ltd.'s control.

44. Reasonable consumers, including Mrs. Fortman, would not have been aware of the defective condition of the vehicle.

45. It was entirely foreseeable and well-known by Defendant Nissan Motor Co., Ltd. that accidents and incidents involving its vehicles, such as occurred herein, would on occasion take place during the normal and ordinary use of said vehicle.

46. The fatal injuries and damages complained of herein occurred because the vehicle in question was not reasonably crashworthy, and was not reasonably fit for unintended, but clearly foreseeable, accidents. The vehicle in question was not unreasonably dangerous in the event it should be involved in an incident such as occurred herein.

47. Defendant, Nissan Motor Co., Ltd., either alone or in conjunction with some other individual(s) and/or entity(ies), designed, manufactured, tested, assembled, marketed and/or distributed said vehicle in question.

48. As detailed herein, the vehicle contains and/or Defendant Nissan Motor Co., Ltd. has committed either design, manufacturing, testing, assembly, marketing and or distribution defects.

49. Defendant Nissan Motor Co., Ltd. either knew or should have known of at least one safer alternative design which would have prevented the fatal injuries to Mrs. Fortman.

50. Defendant Nissan Motor Co., Ltd. failed to provide reasonable protection to front seated occupants after the front seat had collapsed rearward in a rear-impact event.

51. In addition to the foregoing, Defendant, Nissan Motor Co., Ltd., either alone or in conjunction with some other individual(s) and/or entity(ies), designed, manufactured, tested, assembled, marketed, and/or distributed said vehicle in question to be unreasonably dangerous and defective within the meaning of Section 402(A) Restatement (Second) Torts, in that the vehicle was unreasonably dangerous as designed, manufactured, tested, assembled, marketed, and/or distributed because Defendant Nissan Motor Co., Ltd. knew and/or should have known of the following, non-exhaustive list of defects:

52. The vehicle fails to prevent injuries to restrained front seated occupants by intentionally designing the front seat to collapse in rear-impacts.

53. There are no warnings or indications of any nature that advise, warn, or instruct that the

front seats will collapse rearward in rear impact events and that rearward collapsing front seat provides no safety benefit.

54. There is no utility to the front seat or seats when the seats collapse dynamically rearward 60 or more degrees.

55. The front seat has no utility when the seat collapses rearward dynamically and goes beyond 60 degrees.

56. The vehicle's front seats were weak and/or inferior compared to other vehicles that have inch lb. moment capacity that is much greater.

57. The front seats failed to use restraint design that would prevent the restrained front seated occupant from leaving the safe confines of the seat as the front seatback collapsed rearward in rear impact.

58. Defendant Nissan Motor Co., Ltd. failed to conduct rear impact sled and crash tests at or over 25 mph delta V where the front seat was occupied by 95th percentile crash test dummies.

59. Defendant Nissan Motor Co., Ltd. failed to conduct rear impact sled and crash tests at or above 25 mph delta V where there were front or rear seated occupants with 5th, 50th, and/or 95th percentile crash test dummies.

60. Defendant Nissan Motor Co., Ltd. failed to conduct virtual, simulated, and/or computerized simulations to evaluate how to protect front seated occupants in rear impacts when the front seats deform dynamically more than 20 degrees.

61. Defendant Nissan Motor Co., Ltd. failed to conduct the necessary engineering analysis on ways to address how to protect front seated occupants whose front seat has collapsed rearward in rear impact.

62. Defendant failed to use ABTS type seats that have strong rearward inch lb. moment.

63. Defendant failed to use seats that have an inch lb. moment in excess of 30,000 inch lbs.

64. The vehicle failed to distribute and channel crash forces properly in a rear-impact event.

65. The vehicle failed to prevent ejection from the nominal front seating position.

66. The vehicle failed to keep the front seat upright in a rear-impact event.

67. The vehicle failed to have its seat deform rearward dynamically and be limited to 30 degrees.

68. The vehicle failed to utilize a front seat that contained UHSS, boron, ferrite, martensite, AHSS, complex phase, and/or dual phase steel to ensure limited dynamic rearward deformation.

69. The vehicle's seat violated principles of crashworthiness.

70. The vehicle failed to provide any warnings, instructions, and/or advisories regarding front seat collapse.

71. The vehicle was not subjected to any rear impacts with a delta V over 25 mph.

72. The vehicle was not subjected to any rear impact with G's that averaged 15 or more.

73. Defendant Nissan Motor Co., Ltd. failed to test with the proper instrumented crash test dummies during its rear-impact testing.

74. The vehicle failed to have on board cameras during its rear-impact testing.

75. Defendant Nissan Motor Co., Ltd. failed to use a front seat that had the ability to withstand delta V of 35 mph in the rear.

76. Arguments that seats cannot be too strong are belied by convertibles, pick-up trucks with standard cabs, vehicles like taxis and police cars with protective shields behind the front seats, and rear seats with fixed rear bench type seats.

77. Defendant Nissan Motor Co., Ltd. bragged about the safety of its vehicles, the state of the art and technological advancements of its vehicles, and about it being an industry leader in vehicle

safety.

78. Defendant Nissan Motor Co., Ltd. made material misrepresentations that were not accurate or were false and Mrs. Fortman relied upon those representations.

*B. Count Two: Negligence*

79. Plaintiffs incorporate by reference each and all of the allegations contained in the preceding paragraphs as though fully set forth herein.

80. In addition to and/or in the alternative to the product liability claims asserted herein, Defendant Nissan Motor Co., Ltd. was negligent in the design, manufacture, testing, assembly, marketing, and/or distribution of the vehicle in question.

81. Companies that are in the business of designing, testing, manufacturing, marketing, distributing and selling products are never allowed to needlessly endanger consumers.

82. Nothing should be more important to companies that design, manufacture, test and sell products than consumer safety.

83. Because nothing should be more important than consumer safety, companies that design, manufacture, and sell products should always analyze the product for potential hazards or defects at every stage of production.

84. In fact, for automobile manufacturers, in designing a vehicle, efforts should be made by manufacturers to identify potential risks, hazards, and/or dangers that can lead to serious injury or death.

85. Once potential risks, hazards, and/or dangers are identified, then the potential risks, hazards, or dangers should be eliminated if possible.

86. If the potential risks, hazards, and/or dangers can't be eliminated, then they should be guarded against.

87. If the potential risks, hazards, and/or dangers can't be eliminated or guarded against, they should at least be warned about.

88. A company that does not conduct proper engineering analysis that would help it to identify potential risk, hazards, and/or dangers that could seriously injure or kill someone is negligent.

89. Defendant Nissan Motor Co., Ltd. owed a duty to use reasonable care in the design, manufacture, testing, assembly, marketing, and/or distribution of the subject vehicle and yet, they failed, and consequently put a product on the market that was unreasonably dangerous for its intended or reasonably anticipated use as discussed herein.

90. Defendant Nissan Motor Co., Ltd. had a duty to conduct proper engineering analysis and to conduct proper testing that would help it to identify potential risks, hazards, and/or dangers that could seriously injure or kill someone. Defendant breached said duty.

91. With respect to the subject vehicle, based upon information and/or belief, the subject vehicle was not properly tested for the type of rear-impact that occurred in this case to determine what countermeasures were necessary to adequately protect front seat occupants from being harmed when the front seat collapsed in the rear-impact.

92. With respect to the subject vehicle, based upon information and/or belief, the subject vehicle was not properly tested for the type of rear-impact that occurred in this case to determine how the front seat restraint system needed to be designed to provide proper front seat occupant protection.

93. The foregoing acts and/or omissions, defects, and/or negligence of Defendant Nissan Motor Co., Ltd. were the producing, direct, and/or proximate cause of the death of Mrs. Fortman and Plaintiffs' damages.

## VII.    CAUSES OF ACTION AS TO DEFENDANT NISSAN NORTH AMERICA, INC.

*A. Count One: Strict Liability and Defective Design/Manufacture/Failure to Warn*

94. Plaintiffs incorporate by reference each and all of the allegations contained in the preceding paragraphs as though fully set forth herein.

95. Defendant Nissan North America, Inc. is in the business of designing, manufacturing, testing, assembling, marketing, and/or distributing vehicles, including the subject vehicle.

96. Defendant Nissan North America, Inc. designed, manufactured, tested, assembled, marketed, distributed, and/or sold the vehicle that was involved in the accident that killed Mrs. Fortman.

97. The vehicle was defective and unreasonably dangerous for its intended use and was defective at the time it left Defendant Nissan North America, Inc.'s control.

98. Reasonable consumers would not have been aware of the defective condition of the vehicle because most consumers, including Mrs. Fortman, have no idea that front seats are designed to dynamically collapse rearward in a rear-impact event.

99. It was entirely foreseeable to and well-known by Defendant Nissan North America, Inc. that accidents and incidents involving its vehicles, such as occurred herein, would on occasion take place during the normal and ordinary use of said vehicle.

100. The injuries complained of occurred because the vehicle in question was not reasonably crashworthy, and was not reasonably fit for unintended, but clearly foreseeable, accidents. The vehicle in question was unreasonably dangerous in the event it should be involved in an incident such as occurred herein. The vehicle also lacked warnings, instructions, and/or advisories to tell occupants inside the vehicle that the front seats would deform dynamically rearward in a rear-impact which could end up crushing a rear seated occupant, that the rear seated occupant could be

struck by the front seated occupant whose seat deformed rearward or that the front seated occupant may be ejected from the front seat.

101. Defendant Nissan North America, Inc., either alone or in conjunction with some other individual(s) and/or entity(ies), designed, manufactured, tested, assembled, marketed, and/or distributed said vehicle in question.

102. As detailed herein, the vehicle contains and/or Defendant Nissan North America, Inc. has committed either design, manufacturing, testing, assembly, marketing, and or distribution defects.

103. In addition to the foregoing, Defendant Nissan North America, Inc., either alone or in conjunction with some other individual(s) and/or entity(ies), designed, manufactured, tested, assembled, marketed, and/or distributed said vehicle in question to be unreasonably dangerous and defective within the meaning of Section 402(A) Restatement (Second) Torts, in that the vehicle was unreasonably dangerous as designed, manufactured, tested, assembled, marketed, and/or distributed because Defendant Nissan North America, Inc. knew and/or should have known of the following, non-exhaustive list of defects:

104. Failing to warn, instruct, and/or advise owners and users of the vehicle that the front seats can dynamically collapse rearward and that the front seated occupants can be injured or killed because the seat restraint has failed.

105. Failing to warn, instruct, and/or advise owners and users of the vehicle that the front seats can dynamically collapse rearward and that the front seated occupants can strike a rear seated occupant in the head when their seat deforms rearward.

106. Failing to warn, advise, and/or instruct owners and users that the subject vehicle does not provide equal occupant protection to rear seated occupants as it does to front seated occupants.

107. Mrs. Fortman was member of the public that needed to be warned, instructed, and/or

advised that the seat she was sitting in could cause her to be seriously injured or killed because the front seat was designed to collapse rearward in a rear-impact.

*B. Count Two: Negligence*

108. Plaintiffs incorporate by reference each and all of the allegations contained in the preceding paragraphs as though fully set forth herein.

109. In addition to and/or in the alternative to the product liability claims asserted herein, Defendant was negligent in the design, manufacture, testing, assembly, marketing, and/or distribution of the vehicle in question.

110. Companies that are in the business of designing, testing, manufacturing, marketing, distributing and selling products are never allowed to needlessly endanger consumers.

111. Nothing should be more important to companies that design, manufacture, test and sell products than consumer safety.

112. Because nothing should be more important than consumer safety, companies that design, manufacture, and sell products should always analyze the product for potential hazards or defects – at every stage of production.

113. In fact, for automobile manufacturers, in designing a vehicle, efforts should be made by manufacturers to identify potential risks, hazards, and/or dangers that can lead to serious injury or death.

114. Once potential risks, hazards, and/or dangers are identified, then the potential risks, hazards, or dangers should be eliminated if possible.

115. If the potential risks, hazards, and/or dangers can't be eliminated, then they should be guarded against.

116. If the potential risks, hazards, and/or dangers can't be eliminated or guarded against, they

should at least be warned about.

117. A company that does not conduct proper engineering analysis that would help it to identify potential risk, hazards, and/or dangers that could seriously injure someone is negligent.

118. Defendant Nissan North America, Inc. owed a duty to use reasonable care in the design, manufacture, testing, assembly, marketing, and/or distribution of the subject vehicle.

119. Defendant Nissan North America, Inc. failed to use reasonable care when it designed, manufactured, tested, assembled, marketed, distributed, and/or sold the subject vehicle, and consequently put a product on the market that was unreasonably dangerous for its intended or reasonably anticipated use as discussed herein.

120. As noted earlier, most (if not all) engineering associations in the United States (and around the world) have a code of ethics. The number one fundamental canon of ethics for almost all engineers is to "hold paramount the safety, health, and welfare of the public."

121. Accordingly, since paramount means "superior to all others", all vehicle engineers have to hold the safety, health, and welfare of the public as their highest considerations when they design vehicles. Indeed, General Motors, for instance, has admitted under oath that its engineers have to hold paramount the safety, health, and welfare of the public, and that manufacturers have to make efforts to identify potential risks, hazards, and/or dangers that can lead to serious injury or death.

122. With respect to the subject vehicle, based upon information and/or belief, the subject vehicle was not subjected to rigorous engineering analysis, focus groups, evaluations, or research on how to warn, advise, or instruct users that the front seats could deform rearward in a rear impact accident and that the rear seated occupant could be crushed by the front seat or front seated occupant.

123. With respect to the subject vehicle, based upon information and/or belief, the subject

vehicle lacked any warnings to adequately inform front seat occupants that their seat was designed to collapse rearward in a rear-impact.

124. The foregoing acts and/or omissions, defects, and/or negligence of Defendant Nissan North America, Inc. were the producing, direct, and/or proximate cause of the death of Mrs. Fortman and Plaintiffs' damages.

## VIII. DAMAGES

### Wrongful Death of Jay Fortman

125. Plaintiffs incorporate by reference each and all of the allegations contained in the preceding paragraphs as though fully set forth herein.

126. This suit is brought in part pursuant to TEX. CIV. PRAC. REM. CODE § 71.001-71.012 ("Texas Wrongful Death Statute"), commonly referred to as the "Wrongful Death Act," and pursuant to any and all other applicable laws including the common law of the State of Texas.

127. As a proximate result of the above acts and/or omissions on the part of Defendants, Jay Fortman was killed and Plaintiffs have suffered substantial damages for which they seek recovery from Defendants.

128. Erik Fortman and Tyson Fortman are the surviving sons of Jay Fortman, Deceased.

129. Keitha Hernandez is the surviving daughter of Jay Fortman, Deceased.

130. Plaintiffs Erik Fortman, Tyson Fortman, and Keitha Hernandez have suffered and will suffer pecuniary and non-pecuniary losses by reason of the death of Jay Fortman, for which they are entitled to recover. Plaintiffs Erik Fortman, Tyson Fortman, and Keitha Hernandez Individually, and as the Wrongful Death Beneficiaries of Jay Fortman, Deceased, seek all elements of actual damages recoverable by law.

131. Plaintiffs Erik Fortman, Tyson Fortman, and Keitha Hernandez seek to recover for their

past and future pecuniary loss. Pecuniary loss means the loss of the care, maintenance, support, services, advice, counsel, and reasonable contributions of a pecuniary value, including loss of inheritance, that Plaintiffs would have received from Jay Fortman had she lived.

132.   Plaintiffs Erik Fortman, Tyson Fortman, and Keitha seek to recover for their past and future loss of companionship and society. Loss of companionship and society means the loss of positive benefits flowing from the love, comfort, companionship, and society that they would have, in reasonable probability, received from Jay Fortman had she lived.

133.   Plaintiffs Erik Fortman, Tyson Fortman, and Keitha Hernandez seek to recover for their past and future mental anguish. Mental anguish means the emotional pain, torment, and suffering they have and will experience because of the death of Jay Fortman.

## IX.   PRE-JUDGMENT INTEREST

134.   Plaintiffs incorporate by reference each and all of the allegations contained in the preceding paragraphs as though fully set forth herein.

135.   Plaintiffs would additionally say and show that they are entitled to recover pre-judgment interest and attorney's fees in accordance with law and equity as part of their damages herein, and Plaintiffs here and now sue for recovery of pre-judgment interest and attorney's fees as provided by law and equity under the applicable provisions of the laws of the State of Texas.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray that Defendants be cited to appear and answer herein, and that upon final trial, Plaintiffs recover actual and compensatory damages, as specified above, from the Defendants; that Plaintiffs recover costs of Court herein expended; that Plaintiffs recover the interest, both pre-judgment and post-judgment, to which Plaintiffs are entitled under the law; and for such other and further relief, both general and special,

legal and equitable, to which Plaintiffs may be justly entitled.

    Respectfully submitted,

    **THE AMMONS LAW FIRM, L.L.P.**

    _____
    Robert E. Ammons
    Texas State Bar No. 01159820
    John B. Gsanger
    Texas State Bar No. 00786662
    3700 Montrose Boulevard
    Houston, Texas 77006
    Telephone:  (713) 523-1606
    Facsimile:   (713) 523-4159
    E-mail:      rob@ammonslaw.com
    E-mail:      john@ammonslaw.com

    ***ATTORNEYS FOR PLAINTIFFS***